IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

ARTHUR J. JONES, JR.                                                    PLAINTIFF

v.                                              CIVIL ACTION NO. 2:18-cv-84-TBM-MTP

CITY OF HATTIESBURG,
Detective Sergeant NEAL ROCKHOLD,
Individually and as the agent of the
Defendant, City of Hattiesburg                                         DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This case presents a tragic set of circumstances where a young man was killed and an innocent man was arrested for his murder and imprisoned for over eight months. On July 5, 2015, at approximately 2:09 a.m., 17-year-old Jabarri Goudy was shot and murdered in the parking lot of Club Memories in Hattiesburg, Mississippi. Two days later, Arthur Jones, of Gulfport, Mississippi, was arrested for Goudy's murder.

Jones alleges that Defendants lacked probable cause to arrest and detain him for murder. It is now undisputed that Jones did not shoot Goudy and was not even in the same city on the morning of the murder. While there was no physical evidence connecting Jones to the murder scene, there was video surveillance of Jones at Club Illusions in Gulfport, Mississippi, at the approximate time of the murder. Jones alleges that Hattiesburg Detective Neal Rockhold used false and misleading information to obtain the arrest warrant, and that he deliberately concealed exculpatory evidence, causing him to be wrongfully charged and detained. Jones further alleges that Rockhold made false and misleading statements and material omissions when testifying at the preliminary hearing, impacting the finding of probable cause for his continued imprisonment.

Jones has sued the City of Hattiesburg and Detective Rockhold, under 42 U.S.C. § 1983. The City of Hattiesburg and Detective Rockhold, in his official capacity, are entitled to summary judgment on Jones' claims of (1) official policy or custom and (2) failure to train. Defendant Rockhold is not entitled to qualified immunity on Jones' § 1983 claims against him in his individual capacity. In the light most favorable to Jones, material questions of fact remain, as Jones has presented evidence to dispute the information relayed by Rockhold in the Arrest Warrant Affidavit and in Rockhold's testimony at the preliminary hearing. Jones has satisfied his burden of showing that there is a material issue of fact as to whether Rockhold violated his clearly established right to be free from arrest and pretrial detention without probable cause. While a jury may ultimately find in Rockhold's favor, Jones is entitled to present his case to a jury. Defendants City of Hattiesburg and Rockhold are also not entitled to summary judgment on Jones' Mississippi Tort Claims Act claim of reckless disregard. Finally, the defenses of contributory and comparative negligence are waived, as Defendants did not raise them at the appropriate time.

## I. FACTUAL BACKGROUND

On July 5, 2015, at approximately 2:09 a.m., 17-year-old Jabarri Goudy was shot and murdered in the parking lot of Club Memories in Hattiesburg, Mississippi. At the time of the shooting, Goudy and his friend, Devonta Clark, were standing outside of the window of a dark colored car, arguing with the vehicle's occupants. Someone from the front seat of the vehicle shot a gun at Goudy several times, resulting in his death.

### A. The Arrest

Plaintiff Arthur J. Jones, Jr. was arrested and imprisoned on murder charges related to Goudy's death from July 6, 2015 to March 12, 2016. It is now undisputed that Jones did not shoot

Goudy. Further, it is now undisputed that Jones was in an entirely different city when the murder took place.

### 1. The Murder Investigation Begins

At the initial phase of the investigation, detectives conducted multiple interviews with people who were at Club Memories in Hattiesburg, Mississippi, on the morning of the murder.[1]

Devonta Clark, who was standing next to Goudy when he was shot, provided a written statement to the Hattiesburg Police Department at 4:33 a.m. on July 5, 2015. [148-1] at 23. Rockhold described Clark as "the closest person to the car with the best opportunity to observe the occupants." *Id*. at 2. Clark and Goudy were talking to a female in the parking lot of Club Memories in Hattiesburg at closing time. *Id*. at 11. Clark stated that a black Ford Fusion pulled up, and the driver began arguing with them over the female. *Id*. The driver pulled the female into the car and swerved the car towards Clark and Goudy. *Id*. When the driver pulled out a gun, Clark and Goudy started running away from the car. *Id*. Clark stated that six shots were fired, and that he saw Goudy fall to the ground. *Id*. Clark described the occupants of the vehicle as follows: "They're [sic] three people in the vehicle the driver was light skinned dressed with a black v-neck t-shirt levi pant and some black forces." [148-1] at 24.

According to Rockhold, "[o]n July 5, 2015, around [3:30 p.m.], [he] was contacted by Jabarri Goudy's father that one of the suspects was a black male from Gulfport, MS by the name of Montrelle Lee."[2] [148-1] at 12. Upon receiving this information, Rockhold contacted Clark to

---

[1] Hattiesburg Detective Neal Rockhold's investigative narrative contains thirteen pages of details of the investigation. [148-1] at 10-22. Exhibit [148-1] to Defendants' motion is Detective Rockhold's Affidavit in which he provides sworn verification of all of the statements contained in his investigative narrative report. [148-1] at 1.

[2] The record does not indicate that Jabarri Goudy's father was present at the scene or that he witnessed the crime. In the Arrest Warrant Affidavit, Rockhold does not refer to Goudy's father. Rather, Rockhold states that he received a Crime Stoppers Tip. The record is silent as to why Jabarri Goudy's father believed Montrell Lee may have been

set up a meeting. [148-1] at 2. Clark agreed to meet with Rockhold to view a lineup. *Id.* at 12. At their meeting later that same day, Clark picked Montrell Lee out of a six-person photo lineup and provided a written description of him as "the passenger in the vehicle that shot Jabarri [Goudy]." *Id.* at 29-31. At that same meeting, Clark showed Rockhold a Facebook profile picture of Jones and claimed that this was the person who shot Jabarri Goudy. *Id.* at 3. Finally, Clark "stated that Jones' girlfriend, Nijah Gray-Lane, was the female in the car he and Goudy had been trying to talk to. Clark stated that she posted a Facebook picture of herself in the same black dress that he saw her in the night of the shooting." [148-1] at 12.

Two days later, on July 7 at 10:39 a.m., Rockhold conducted another six-person photo lineup with Clark. Clark picked Timothy Donaldson from the lineup and provided a written description of him as "the shooter."[3] [158-17]. Four minutes later, at 10:43 a.m., Clark participated in a second six-person photo lineup where he chose Jones and provided a written description of him as "the shooter." [148-1] at 38-40. It is undisputed that there was only one shooter involved. [148-3] at 144-47. A comparison of lineup photographs of Timothy Donaldson ([158-17]) and Jones ([148-1] at 40) reflects that these two individuals bear little to no resemblance to each other, as the individuals have different facial features and Donaldson has a close-cut hair cut while Jones has dreadlocks.

Clark also picked Keith Lee out of a six-person lineup, providing a written description of him as "the passenger in the suspect vehicle." [148-1] at 35-37. This was contrary to Clark's earlier identification of Montrell Lee as the passenger. Finally, at 10:45 a.m. on July 7, Clark picked

---

involved, and the record is also silent as to whether Rockhold asked Goudy's father for the basis of his knowledge. As set forth later in this opinion, information on Facebook began circulating shortly after the shooting.
[3] Rockhold testified that Timothy Donaldson was added to the lineup randomly. [148-4] at 144.

Brianna Patton out of a six-person photo lineup, providing a written description of her as the "girl in the suspect's car." [172-1], [148-4] at 78.[4]  After picking Brianna Patton out of the lineup, which was also recorded on video, Rockhold showed Clark a page that only contained Facebook photographs of Jones' girlfriend, Nijah Gray-Lane. [158-16].  Rockhold first folded the paper to show a singular photo of Gray-Lane.  [163] at Exh. 29.  Then, Rockhold asked Clark, "Is that the dress you saw? Is that the girl that you saw that you were talking to?"  *Id*.  Clark responded in the affirmative, but he stated he was only about 65% certain.  Rockhold told him to "write on there that's the female that you saw."  *Id*.  Clark complied, writing "this is the female I saw" by Gray-Lane's photograph. [158-16].  In sum, Clark identified two different people (Timothy Donaldson and Arthur Jones) as the "shooter," two different people (Montrell Lee and Keith Lee) as the male passenger, and two different people (Brianna Patton and Nijah Gray-Lane) as the female passenger.

On July 7, Tamara Rice gave a written statement to Hattiesburg Detective Jeremy Dunaway.  Rice said she was in her car in the parking lot at Club Memories when she heard shots.  She saw someone falling to the ground when she looked in her mirror. [158-13].  After Rice left the scene, she was "told it was the dread hed [sic] light skin guy."  *Id*.  After interviewing Rice and another female who was at the scene, Rockhold noted that "neither witness saw the suspect" in his investigative narrative. [148-1] at 14.  Once Rice made her statement, Detective Dunaway conducted a six-person photo lineup with Rice which was recorded on video.  Rice selected Jones' photograph and provided a written description on the form that the "photograph was that of 'Arthur Jones J. I saw him standing outside with homeboy.'"  *Id*. at 41-43.  When Detective

---

[4] Citations to the record indicate page numbers according to the manner in which each document is docketed and may not coincide with deposition/exhibit page numbers.

Dunaway asked her to document how certain she was that Jones was on the scene, using a 0-100% scale, she wrote "0-100% I saw this guy standing outside with a homeboy" next to Jones' photograph. [148-1] at 42; [163] at Exh. 26. When asked if she was 100% certain that she saw Jones outside, she shook her head in a negative way and stated "it was somebody that looked like him but I don't … but like … (unintelligible)." [163] at Exh. 26.

Jerry Carney, who was interviewed a couple hours after the murder, stated that he did not get a good look at the driver and only saw his arm. [163] at Exh. 28. At his second interview, on July 7, when asked whether he had seen the driver or the passenger, Carney shook his head from left to right and stated "No … I did not … I did not … uh … the driver had dreads." *Id.* After indicating a second time in his recorded interview that he did not see the driver, he ultimately picked Jones out of a photo lineup, and provided a written description that "[t]his is the person who shot Jabarri." [148-1] at 47. In his deposition, Rockhold admitted that Carney did not make a positive identification of Jones. [148-3] at 165.

Naporsha Thompson was also interviewed when she approached the police about the murder. In her interview on July 6, Thompson admitted to investigators that a picture of Jones was sent to her with a message indicating that she needed to "tell the police if they saw that person [Jones]." [148-1] at 13. She referred to Facebook photos and videos several times during her interview. [148-1] at 56-57. She also pointed out a video on Facebook that someone posted of Jones at Club Illusions (Gulfport) on the night in question, stating that the video was taken at Club Memories (Hattiesburg). *Id.* at 13-14, 57. Rockhold claims that Thompson identified Jones. Thompson's identification of Jones may have come from the two black and white photographs attached to her written statement. *See* [148-1] at 58-59. Both photographs appear to have been

printed off of an unidentified Facebook page. Detectives did not record a video of a photo lineup conducted with Thompson, and a copy of a photo lineup, if one was conducted, was not provided to the Court.

In his initial meeting with investigators on the morning of the murder, Antonio Crosby "stated that he was in the parking lot of Club Memories when he heard two gunshots and noticed that Goudy had been hit." [148-1] at 11. There was no indication that he saw the shooter. Two days later, on July 7, Crosby was interviewed by Rockhold and participated in a video recorded photo lineup. In the interview, Crosby admitted that he viewed Jones' Facebook page before participating in a video identification with Rockhold. [148-3] at 164. Rockhold knew that individuals on Facebook were pointing the finger at Jones, and that his photo was being heavily circulated on Facebook.[5] [148-1] at 3, 12-16, and 56. Crosby selected Jones from the photo lineup and provided a written description of him as follows: "While I was inside of Club Memories a man walked past me 2-3 times, I just didn't recognize him." [148-1] at 44.

Jonathan Goudy was in the car that transported his cousin, the victim, to the hospital. He met with several officers while he was still at the hospital during the morning of July 5. [148-1] at 10. Goudy did not tell officers that he saw the shooter. Jonathan Goudy sent Jones a private Facebook message on July 6 indicating that he believed Jones was involved with the murder. [158-20]. On July 7, Jonathan Goudy picked Jones out of a six-person photo lineup, stating "when I raned [sic] over their [sic] I seen [sic] the light skin yellow dude flee off in a black honda." [148-1] at 50.

---

[5] *See* [148-1] at 3, 12 (Clark made his initial identification of Jones by showing Rockhold Jones' Facebook profile picture); [148-1] at 13 (Naporsha Thompson admitted that she had received a picture of Jones before her interview and used Facebook photos to make an identification of Jones); [148-1] at 15 (Akissa Booker told investigators she saw a Facebook photo of Jones going around).

### 2. Rockhold's interviews of Jones and Keith Lee

On July 6, 2015, Jones voluntarily appeared at the Gulfport Police Station where he waived his *Miranda* rights and agreed to be interviewed by Rockhold. [163] at Exh. 24. In addition to voluntarily coming in for an interview, Jones gave Rockhold access to his cell phone. [148-4] at 100. During this interview, which was recorded by video, Jones told Rockhold that he wanted to clear his name of the false accusations against him that were all over Facebook. [163] at Exh. 24. Jones was adamant that he was not in Hattiesburg on the morning of the murder. He also described the events of the entire evening that he had spent with his cousin, Keith Lee, in Gulfport, Mississippi and Slidell, Louisiana. *Id.* When questioned about his girlfriend, Nijah Gray-Lane, Jones explained that they were not together on the night in question. *Id.* Jones described a prior incident where a large group of people, including several from Hattiesburg, "jumped" Keith Lee and Jones outside of Club Illusions in Gulfport. *Id.* Maintaining his innocence the entire time, Jones suggested to Rockhold that this may be a situation where someone was trying to frame him. *Id.*

Jones asked Rockhold if he would be checking the surveillance video from Club Illusions, as that would prove that he was in Gulfport at the time of the murder. *Id.* According to Rockhold's investigative narrative, "Jones was adamant that Club Illusions would have him on video surveillance on July 4th and July 5th." [148-1] at 12-13.

Keith Lee, Jones' cousin, also came in to be interviewed by Rockhold at the Gulfport Police Department on July 6. [163] at Exh. 30. When Lee mentioned the specific time of the murder, Rockhold questioned his basis of knowledge, as Rockhold did not believe that the time was public information. *Id.* Lee responded that this story had gone viral and was all over Facebook. *Id.* While

Lee did not have Facebook, he learned about the details of the incident from his wife who saw it on her Facebook page. *Id.*

After their interviews in Gulfport, Jones and Keith Lee were transported to the Hattiesburg Police Department, where Detective Rockhold conducted a second, video-recorded interview with Jones. [163] at Exh. 25. After Rockhold showed Jones a video from Jones' phone, Rockhold asked him where the video was taken. *Id.* Jones stated that his cousin, Keith Lee, took the video of him on stage at Club Illusions in Gulfport. Rockhold indicated that he did not believe Jones and said that the video was taken at Club Memories in Hattiesburg. *Id.* Rockhold further stated that the police had definitive proof, including photographs, that Jones was inside Club Memories on the night of the murder. *Id.* Rockhold also told Jones that the GEO tracking function placed Jones' phone in Hattiesburg on the night of the murder. *Id.* While Jones repeatedly told Rockhold that the video was from Club Illusions, Rockhold told him he was being charged with murder, and that he is "sick and f***ing tired" of Jones lying to him. *Id.*

In his deposition, Rockhold admitted that, contrary to what he told Jones, he never had a photograph or a video of Jones in Hattiesburg at the time of the murder. [148-3] at 27. Further, after the arrest but prior to the preliminary hearing, cellphone records indicated that Jones' phone had connected to a cellphone tower in Gulfport on the night and morning of the murder, and it had not connected to a cellphone tower in Hattiesburg. [148-3] at 39, 65.

### 3. Role of Facebook

As mentioned by the witnesses discussed above, the murder had gone viral and photographs and information were being posted by people with no personal knowledge. There were rumors going around on Facebook that Jones was the shooter. During his deposition,

Rockhold confirmed that he was aware that every witness he interviewed had looked at Facebook photographs of Jones before any of them came in to speak to investigators or to make identifications. [148-3] at 60-61, 172. Rockhold also testified he knew that all of these witnesses had received photographs of Jones from someone else before interviewing with investigators. *Id.* at 61. In his interview with Jerry Carney, Rockhold interrupted one of his answers stating, "I know there's been a lot of pictures going around on Facebook." [148-3] at 171. In his interview with Antonio Crosby, Rockhold stopped him when he mentioned Facebook, telling him that they needed to stay away from Facebook. [148-3] at 163-64. In one of his interviews with Clark, Rockhold told him that "we don't want to talk about that," referring to a photograph from Facebook. *Id.* at 140-41.

### 4. Rockhold's Underlying Facts and Circumstances in support of the arrest warrant

Municipal Justice Court Judge Jerry Evans issued an arrest warrant for Jones on July 7, 2015. The warrant was based on the Underlying Facts and Circumstances ("Arrest Warrant Affidavit") prepared by Rockhold. [158-1] at 9-11. Since the Arrest Warrant Affidavit was the basis for Judge Evans' determination of probable cause for the arrest, which is specifically at issue in this case, the Court sets forth the complete language below:

> On 7-5-15 at approximately 0209 hours, while in route to 1720 N31st Ave. (Club Memories) in reference to a shooting, Officer Patterson was notified by Officer Wheeler who was already on scene, that the victim was being driven to Forrest General Hospital in a light colored Mercury Grand Marquis. At the intersection of Hwy 49 and N31st Ave. Officer Patterson observed a light colored vehicle leaving the scene at a high rate of speed with the hazard lights flashing. Officer Patterson then got behind the vehicle and followed it to Forrest General Hospital. Upon arrival at Forrest General Hospital, the vehicle came to a stop and three black males exited the vehicle. The driver opened the rear passenger door. Officer Patterson observed a large black male, later identified as Jabarri Goudy, fall partially out of the vehicle. At that time, Goudy did not have a pulse. Officer

Patterson then assisted hospital personnel in getting Goudy onto the stretcher, and he was taken into the hospital.

Around 1530 hours, Sergeant Rockhold received a Crime Stoppers tip, that one of the suspects who shot Goudy was Montrell Lee. Sergeant Rockhold placed a photograph of Lee in a six-person line up and presented the line-up to Devonta Clark, who was with Goudy when he was shot. Clark positively identified Lee as the passenger in the vehicle that shot Goudy. Clark then pulled up a FaceBook profile belonging to "Jones A. Hunnit Million", and advised Sergeant Rockhold that this was the shooter. Through further investigation, Sergeant Rockhold was able to identify Arthur James Jones, Jr. as the owner of that FaceBook profile and the murder suspect.

On 07/06/2015, Arthur Jones Jr. and Montrell Lee turned themselves in at the Gulfport Police Department. Sergeant Rockhold relocated to Gulfport Police Department and met with Jones and Lee. Sergeant Rockhold read Jones and Lee their Miranda Rights and both individuals waived their right to a lawyer and agreed to speak with Sergeant Rockhold. Sergeant Rockhold was advised by Jones and Lee that Jones had been at Club Illusions in Gulfport with his cousin, Keith Lee, from 0145 hours to 0400 hours. Jones and Lee signed consent forms allowing Sergeant Rockhold to access their cellular telephones data. Sergeant Rockhold located video of Jones and Lee at Club Illusions, however, the date and time appeared to have been altered superficially and a further investigation showed that the video was taken on a later date than what was told to Sergeant Rockhold. Sergeant Rockhold also noted that phone calls from Jones to Lee throughout the night on July 4th were deleted from Jones' phone; however, the calls were not deleted from Lee's phone log. Jones and Lee also stated that they went to Slidell, LA to purchase daiquiris at 0050 hours on 07/05/2015 and then drove to Gulfport and arrived at Club Illusions at 0145 hours. Sergeant Rockhold had Gulfport Police Department check the tag readers for Lee's vehicle tag. Sergeant Rockhold was informed that the vehicle Lee owns was not picked up by any tag readers since June 18th, when he went to Slidell, LA. Jones, Keith Lee and Montrell Lee were then arrested. Jones was charged with murder and the Lee brothers were charged with hindering a police investigation. Multiple photographic line ups were created with Jones, Keith Lee and Montrell Lee. Jones and Keith Lee were identified by several subjects, who were at Club Memories, as being at Club Memories and that Jones was the shooter.

## B. The Investigation Continues After Jones' Arrest

In the days following Jones' arrest, Rockhold and other members of the Hattiesburg Police Department continued their investigation. Throughout this process, Jones maintained his innocence and stated the video surveillance from Club Illusions (Gulfport) would prove that he

was not in Hattiesburg at the time of the murder. Investigators obtained the surveillance videos from Club Illusions on July 18, 2015, eleven days after Jones' arrest.

### 1. Surveillance Videos from Club Illusions

Investigators made two trips to Club Illusions in an effort to view and obtain surveillance videos from the night in question. According to Detective Dunaway, he determined the timestamp on the video was off by forty-five minutes on their first trip by comparing the time on his watch to the live video. [148-4] at 119. The owner of Club Illusions, George Bush, also stated that he observed detectives determine that the time of the video was off by forty-five (45) minutes by comparing the time on the surveillance video against the times on their own watches. [158-2] at 1. Included on a handwritten page in Rockhold's investigation file is a note that the "45 minute time delay on video from club (0245 shows 0200)." [158-19]. In his deposition, however, Detective McLemore claimed there were issues with the timestamp on the video that could not be resolved.[6] [148-5] at 132. Detective Rockhold first testified, in his deposition, that the timestamp was off by 45 minutes. [148-3] at 77, 89. Then he stated that he did not believe that his note meant that he "knew the time was exactly 45 minutes off and that was confirmed." *Id.* at 90.

After seizing the DVR equipment from Club Illusions on July 18, detectives continued to closely review the surveillance video. In his investigative narrative, Rockhold stated that "Keith Lee is seen throughout the night; however, there is a large amount of time that Arthur Jones is

---

[6]On the morning of the murder (July 5) at approximately 5:15 a.m., members of the Gulfport Police Department responded to a call from Club Illusions stemming from a fight among employees. [158-2] at 3. George Bush, the owner, was present at the club both before and after officers arrived. Bush reviewed the surveillance videos as well as the Computer Assisted Dispatch (CAD) report on the incident from the Gulfport Police Department. *Id.* at 4. The timestamp on the Club Illusions video indicated that the police arrived at the club at 4:31 a.m., and the CAD report from the incident reflects that officers arrived at the club at 5:17 a.m. *Id.* at 4, 9. This further supports that the timestamp of the surveillance video was off by approximately 45 minutes. None of the investigators working the Jones case obtained the CAD report from the Gulfport Police Department. [148-5] at 20-21.

absent from surveillance cameras." [148-1] at 17. According to Rockhold, Jones was absent long enough for him to have made it to Hattiesburg and back. [148-3] at 87-88. Club Illusions is located at 1925 34th Street in Gulfport. [158-2] at 9. Club Memories is located at 1720 North 31st Avenue in Hattiesburg. [148-1] at 10. The driving distance between Club Illusions and Club Memories is approximately seventy (70) miles. In his deposition, Rockhold testified that while it depends on how fast one drives, it would take Rockhold forty-five (45) minutes to drive from Club Illusions to Club Memories. [148-3] at 82-83. Plaintiff indicates that it would take a great deal longer to drive the seventy (70) miles. Even if one could make the drive in forty-five (45) minutes, Jones would have had to have been absent from Club Illusions for at least an hour and a half to be able to drive from Club Illusions to Club Memories and back to Club Illusions. *Id.* at 83.

Jones contests Rockhold's position that "Jones was not clearly seen in segments of the video for a length of time sufficient to enable him to commit the crime." [158-1] at 2; [148-1] at 5. Jones claims that he could have identified himself on the videos, had detectives asked him to do so. [158-1] at 3. Neither Jones nor his attorney were provided with copies of the surveillance video before the preliminary hearing. *Id.*

During Rockhold's deposition, he looked at still shots from several Club Illusions surveillance video clips from the morning of the shooting, July 5. Rockhold stated that Jones can be seen on video clips with the following timestamps: 1:00 a.m., 1:12 a.m., 1:22 a.m., 2:00 a.m., 2:24 a.m., and 3:17 a.m. [148-3] at 101-21, 127-28. Rockhold agreed that if the "45 minute time delay on video" were added to each of those times, the respective times would be as follows: 1:45 a.m., 1:58 a.m., 2:07 a.m., 2:45 a.m., 3:09 a.m., and 4:03 a.m. *Id.* Rockhold further stated that if

those times were correct, then it would not be possible for Jones to have been in Hattiesburg at 2:09 a.m., which was the time of the murder. *Id.*

## 2. Witness Identifications

Rockhold and other detectives continued interviews of people who were at Club Memories in Hattiesburg on the morning of the shooting. Devonta Clark was Rockhold's primary eyewitness, as Clark was standing next to Jabarri Goudy when he was shot. Clark initially identified Nijah Gray-Lane, Jones' girlfriend, as the female passenger in the suspect's car, by showing Rockhold a Facebook photograph of her. Clark later identified another female, Brianna Patton, as the female passenger. On July 13, 2015, Rockhold received video surveillance from Harrah's Casino, which confirmed that Gray-Lane was in Gulfport at the time of the murder. [148-1] at 17.

On July 9, Devonta Clark was interviewed again. Clark told the Detective that:

> [H]e identified the suspects from pictures that were sent to his phone from Harold Keys and Akissa [Booker]. Clark stated that the pictures were found from FaceBook; however, he had never met the suspects before.

[148-1] at 16. Later that same day, Detective Dunaway interviewed Deon Arrington who was also at Club Memories on the morning of the murder. Arrington stated that he heard the gunshots and saw Goudy fall to the ground. *Id.* at 17. About an hour after the shooting,

> [Arrington] was speaking with his cousin, Bernard Frye [of Gulfport], who said that he was going to send [Arrington] a picture of the suspect so he can send it to [Akissa] Booker and then show the picture to [Devonta] Clark in order to help police catch the suspects.

*Id.* The next day, Rockhold interviewed Bernard Fry, in Gulfport. Rockhold questioned Fry as to why he sent the picture of Jones to Deon Arrington.

> Fry stated that Arrington called him and asked him who had dreadlocks with a vehicle that had a Harrison County tag. Fry stated that on July 3, 2015, he saw

Arthur Jones in Club Envy in Gulfport, MS and he fit the description that Arrington gave him, which is why he sent Arrington Jones' picture.

*Id.* at 17.

Deja Lindsey came in for an interview, on July 9, after receiving several Facebook messages that she should do so. In his investigative narrative, Rockhold noted:

> Lindsey advised that she was a part of the fight including the other females at Club Memories prior to the shooting. Lindsey stated that she saw a black Dodge Charger pull up and four males ran to the vehicle and began hitting the passenger of the car. The passenger of the vehicle, a black male with dark skin, black t-shirt and dreadlocks, pulled a gun and started shooting. The black Charger left the parking lot and Goudy fell to the ground. Lindsey stated that she had received multiple FaceBook messages telling her to come to the police and tell what she saw; however, Lindsey later stated that her FaceBook was deactivated.

[148-1] at 15. In the six-person photographic lineup, of which a video was not provided, Lindsey identified Jones, stating that "number 6 was the shooter with the long dreads dark skin and black Tshirt that fired shots." [148-1] at 53.

### 3. Jones' Cell Phone Records

At some point between the time of Jones' arrest on July 6 and the preliminary hearing on July 29, Rockhold obtained Jones' cell phone records. According to those records, Jones' cell phone "never connected to or pinged a tower near the city of Hattiesburg on the night of July 4th or the morning of July 5th of 2015." [148-3] at 39. Rockhold was aware that Jones' cell phone had only "pinged" a tower in Gulfport during that time frame. *Id.* at 65.

### 4. Rockhold's Affidavit in Support of his Motion for Summary Judgment

The Affidavit that Rockhold prepared in support of the Motion for Summary Judgment describes an elaborate look-alike theory and motive for the murder. According to Rockhold's Affidavit, investigators believed that Jones and Keith Lee may have used t-shirts they purchased

from Wal-Mart, which were the same color as the ones they were already wearing, to plant look-alike alibis for Jones and Lee at Club Illusions. [148-1] at 5. Rockhold states that investigators learned that Jones had previously been in a fight outside of Club Illusions and suspected that Jones retaliated and traveled to Hattiesburg to perform a "hit." *Id.* at 5. According to Rockhold, "[f]urther substantiation was created by the fact that at the approximate time of the murder, Keith Lee, the Club Illusions owner, and a security guard are seen talking on the Club Illusions surveillance video, which we believed validated their participation and the plan to smuggle Jones back into the club." [148-1] at 6.

It is unclear when this theory was developed, as it is not mentioned in Rockhold's thirteen-page, detailed investigative narrative. Nor did Rockhold include this theory in the arrest warrant or in his testimony at the preliminary hearing. Notably, Rockhold relies on the accuracy of the timestamp on the Club Illusions surveillance video to support his theory of Jones' guilt but states that the times could not be determined when Jones uses the same video to support his alibi. Similarly, Rockhold relies on Devonta Clark's identification of Keith Lee as the passenger in the shooter's car to support the arrests, but under the look-alike theory, Rockhold claims Keith Lee was at Club Illusions in Gulfport at the time of the murder.

### 5. Preliminary Hearing

On July 29, 2015, Judge Gay Polk-Payton, a Justice Court Judge for Forrest County, presided over Jones' preliminary hearing. There is no record from the preliminary hearing, but Judge Polk-Payton took notes during the proceeding, and she was also deposed. [148-10] at 22. According to Judge Polk-Payton, Rockhold was the only witness who testified at the hearing. Rockhold testified that there were six individuals who identified Jones as either being at the scene

or the shooter. *Id.* at 26, 28. According to Judge Polk-Payton, Rockhold also testified that Jones claimed to have been in Slidell, Louisiana from 1:45 a.m. to 4:00 a.m. on the morning of the murder. *Id.* at 89. In addition, Rockhold testified that there was no activity on Jones' cell phone from "10:45 p.m. to 9:00 a.m. Appears that calls were deleted." [148-10] at 114-15.

Rockhold further testified that Jones was seen on surveillance video from Club Illusions in Gulfport. *Id.* at 30. Judge Polk-Payton made a note that the owner of Club Illusions told detectives that the times on the video are incorrect. *Id.* at 43. During his testimony, Rockhold did not tell Judge Polk-Payton about the note he made in his file that there was a "45 minute time delay on video from club (0245 shows 0200 a.m.)." *Id.* Nor did Rockhold tell her that detectives had made a determination of the forty-five minute delay by comparing the time on their watches to the time on the surveillance video. *Id.* at 44.

In her deposition, Judge Polk-Payton agreed that if the video was forty-five minutes off, according to Rockhold's note, then 1:45 a.m. would be reflected on the surveillance video as 1:00 a.m. *Id.* at 54. Judge Polk-Payton further agreed that if Jones was seen on the video at 1:00 a.m. which would have actually been 1:45 a.m., assuming the time was off as stated in Rockhold's note, then Jones could not have been in Hattiesburg at 2:09 a.m., the time of the murder. *Id.* No videos of the witness interviews or surveillance videos from Club Illusions were shown at the preliminary hearing.

While Rockhold testified that six eyewitnesses positively identified Jones as either being at the murder scene or the actual shooter, Rockhold did not provide any details as to the actual identifications and did not address any potential credibility issues. Nor did he mention any witness by name. [148-10] at 78. Rockhold did state that there was one eyewitness who was standing with

the victim when he was shot. [148-10] at 97. Accordingly, Rockhold have must meant Devonta Clark. Judge Polk-Payton indicated that the testimony of a person standing with the victim would be important evidence because "[t]hey would have seen the person, possibly have seen the person who shot him." *Id.* at 98. In addition to the other misidentifications by Clark, Rockhold did not testify that on July 13, he received video confirmation that Nijah Gray-Lane, Jones' girlfriend, was in Gulfport on the night of the murder. [148-10] at 78.

When asked about the principal evidence that was used at the preliminary hearing to find probable cause to bind Jones over to the grand jury, Judge Polk-Payton stated:

> It would have been the eyewitness testimony mainly. And the surveillance video information was mostly speculative, from what I understood. And, you know, just said that the times were incorrect. They said somebody said something about the men were in Slidell, and then somebody said something about them being at Club Illusions in Gulfport and the times were not specific.

*Id.* at 73. Jones' attorney, Craig Rose, was also present at the preliminary hearing. Rose recalls Rockhold's testimony at the preliminary hearing was "we've got six witnesses. That's basically what it was." [158-4] at 25, 28. Rose was unaware that Rockhold had obtained the surveillance video at the time. If he had known about it, Rose would have requested a copy. *Id.* at 20-21. Rose testified in his deposition that if the surveillance video had been shown at the preliminary hearing, "[p]robable cause would not have been found. And not just in that court, any judge in Hattiesburg." *Id.* at 23.

## C. Jones' Continued Imprisonment

After the preliminary hearing on July 29, 2015, Jones was imprisoned until he bonded out on March 12, 2016, over seven months later. Jones' bond, which was initially set at $500,000, was reduced to $50,000 in March, 2016. [27] at ¶¶ 40, 45.

### 1.  A new set of suspects

On November 10, 2015, Rockhold received a call from an inmate at the Forest County jail who claimed that his girlfriend, Tyhecia Bender, was the female passenger in the shooter's vehicle. [148-1] at 6. Rockhold conducted an interview with Bender on December 1. [148-3] at 198.  Bender stated that on the morning of the murder, she had fallen asleep in her then boyfriend's car outside of Club Memories.  She awoke to gunshots being fired and the car speeding away.  The driver of the car was her boyfriend at the time, Andreco Guston. *Id*. at 199-203.  Bender was interviewed again on December 9, participated in a polygraph exam on December 10, and submitted a written statement following the polygraph. [148-1] at 19.  During the detectives' interactions with Bender, details of the shooting were revealed, along with the name of another passenger, James McKenzie. *Id*.  When Rockhold interviewed McKenzie on December 11, his recollection of events was consistent Bender's. *Id*.

On December 7, Rockhold met with Andreco Guston at the Hattiesburg Police Department. [148-1] at 19.  Guston did not provide a statement and was arrested on other charges. *Id.*  Following this meeting, Rockhold obtained a search warrant for Guston's residence. [173-1]. In the affidavit he prepared in support of the search warrant, dated December 7, 2015, Rockhold attests that the occupants of the car involved in the shooting death of Jabarri Goudy on July 4, 2015 were:

> Tyhecia Bender and the suspected shooter was identified as Andreco Guston. Through further investigation, the identities of the two occupants previously named were confirmed.

*Id*.  There is no mention of Jones' arrest or of Jones' continued imprisonment in the affidavit in support of the search warrant.

On December 18, 2015, Rockhold submitted the dress Bender was wearing on the morning of the shooting to the Mississippi State Crime Lab for gunshot particle analysis. [148-1] at 20. On February 22, 2016, Rockhold received results from the analysis which indicated a positive presence of gunshot residue. [148-1] at 20.

Rockhold, Detective McLemore, and District Attorney Patricia Burchell met to discuss the case after Rockhold's interviews with Bender and McKenzie. According to Rockhold,

> We went over the entire scenario with Jones and Lee being arrested, being identified by six separate people. Then we went over the statements from Tyhecia Bender and Jeremy McKenzie. And I believe we also talked about the Facebook pictures.

[148-3] at 232. Rockhold began discussing with the District Attorney about the fact that Jones and Keith Lee were still in custody, in light of the new evidence. *Id.* at 235.

At this point, either Rockhold or Detective McLemore suggested to the District Attorney that they offer a polygraph test to Jones. [148-3] at 235-36. Jones was given a polygraph exam, and according to the person who interpreted the results, Jones did not pass. *Id.* at 237. These results were not included with the case file. *Id.*

On March 8, 2016, a few weeks after Bender's dress was returned from the crime lab, Rockhold re-interviewed one of the initial witnesses in the case, Bernard Fry. [148-3] at 247. Bernard Fry was one of the people who was responsible for sending Jones' Facebook picture to Devonta Clark. During this interview, Rockhold claims that he determined that the individuals who had originally circulated the photograph of Jones were connected with a gang that had been involved in the prior altercation with Jones. [148-1] at 7. Rockhold states that this revelation showed that Jones and Lee had been misidentified, and Rockhold requested bond reductions from the prosecutor. *Id.* at 7-8. After his bond was reduced, Jones bonded out of jail on March 12, 2016.

On March 14, 2017, the grand jury indicted Andreco Guston for the murder of Jabarri Goudy. [148-2] at 109. Rockhold claims that when Guston was indicted, he thought Jones would be "no billed" by the grand jury. [148-1] at 8. When Rockhold learned that Jones was still driving to Hattiesburg monthly to comply with reporting requirements, he contacted the District Attorney's office to request that Jones and Keith Lee refrain from reporting. [148-1] at 8. Rockhold did not know that the District Attorney's office had elected not to seek a true bill against Jones until the instant lawsuit was filed. *Id.*

### 2. District Attorney Patricia Burchell

The District Attorney mostly relied on the information provided to her by the Hattiesburg Police Department. For example, the District Attorney was unaware that Devonta Clark had identified Timothy Donaldson as the shooter before identifying Jones as the shooter. [148-2] at 16. She never viewed the video surveillance from Club Illusions or any of the witness photo identification videos. *Id.* at 11, 16. Detectives Rockhold and McLemore only told Burchell that there were issues with the surveillance video from Club Illusions in terms of the timestamp and possibly the quality of the images. *Id.* at 33-34. While she did not recall the specifics, Burchell was aware that Nijah Gray-Lane, Jones' girlfriend, had been cleared of charges, as her alibi had been confirmed. *Id.* at 61.

When asked about Rockhold's entry in his investigative narrative, dated December 18, 2015, that he had reason to believe that Jones had been falsely accused, Burchell stated that she was not advised of that information at the time. *Id.* at 87. If Rockhold had advised her of his assessment, Burchell "would have made sure that [Jones] got out of jail." *Id.* According to Burchell, the Hattiesburg Police Department had the authority, as the arresting agency, to dismiss

the charges against Jones at any time. *Id*. at 103. Jones remained charged with murder until October 10, 2017. [27] at ¶ 63.

## II. PROCEDURAL HISTORY

Jones filed his Amended Complaint[7] on August 2, 2018 against the City of Hattiesburg and Officer Neal Rockhold under 42 U.S.C. § 1983, alleging false arrest, false imprisonment, and denial of a speedy trial. Jones claims that Rockhold violated his rights under the Fourth and Fourteenth Amendments. Jones also asserts claims of official policy or custom and failure to train against the Defendants. Finally, Jones brings a number of state law claims against Defendants including a Mississippi Tort Claims Act claim for reckless disregard of the Plaintiff's safety and well-being, malicious prosecution, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, slander per se, and negligence per se.

On November 1, 2020, Jones filed a [143] Motion for Partial Summary Judgment based on Defendants' alleged failure to plead contributory or comparative negligence as an affirmative defense. On November 6, 2020, Defendants filed a Motion for Summary Judgment [148] on the grounds that: (1) the City of Hattiesburg could not be held liable under § 1983 because there was no evidence linking the alleged constitutional violation to a policy, practice, or custom of the City,[8] nor was there evidence that the City of Hattiesburg was deliberately indifferent in the training and supervision of its officers; (2) Detective Rockhold could not be liable under § 1983 because his actions are shielded by qualified immunity; and (3) Plaintiff's state law claims should be dismissed.

---

[7] Jones filed his original complaint in the Circuit Court of Forrest County, Mississippi on May 1, 2018. The case was removed to this Court on May 15, 2018.

[8] Defendants filed a [164] Motion to Strike exhibits pertaining to these claims. Ultimately, the Motion to Strike is moot because these claims are dismissed.

### III. SUMMARY JUDGMENT STANDARD

Summary Judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment it to isolate and dispose of factually unsupported claims or defenses. *Cleotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The mere existence of a disputed factual issue does not foreclose summary judgment. "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004) (quoting *Hanchey v. Energas Co.*, 925 F.2d 96, 97 (5th Cir. 1990)).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Cleotex*, 477 U.S. at 323. The nonmoving party must then "go beyond the pleadings" and "set forth 'specific facts showing that there is a genuine issue for trial.'" *Id.* (citation omitted).

### IV. DISCUSSION AND ANALYSIS

#### A. Section 1983 Claims Against Hattiesburg and Rockhold in his official capacity

Suits against governmental officers or employees in their official capacity are, in reality, suits against the entity that the officer represents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."); *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) ("[a] plaintiff seeking to recover on a damages judgment in an official capacity suit must look to the government entity itself.").

Therefore, Jones' claims against Rockhold in his official capacity are claims against the City of Hattiesburg and will be analyzed as such.

### 1. Official Custom or Policy Claims

To establish liability under 42 U.S.C. § 1983 against the City of Hattiesburg, Jones must show that any constitutional violation by Rockhold was done pursuant to a policy of Hattiesburg. "Policy" in this context means either an official policy adopted and promulgated by a city policymaker, or a "persistent, widespread practice" of officials or employees that "is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). For a "custom" to constitute a policy, a policymaker must have either actual or constructive knowledge of it, and the policymaker must be a lawmaking officer or "an official to whom the lawmakers have delegated policy-making authority." *Webster*, 735 F.2d at 841.

In order to recover against the City of Hattiesburg based on an official policy or custom under § 1983, Jones must demonstrate the following: (1) an official policy or custom of which (2) the policymaker can be charged with actual or constructive knowledge and (3) a constitutional violation whose "moving force" is that policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Jones "must identify the policy, connect the policy to the [City of Hattiesburg] itself and show that the particular injury was incurred because of the execution of that policy." *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984). *See Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997) (stating that it is the plaintiff's burden to identify a municipal policy or custom which proximately resulted in the plaintiff's constitutional injury). Additionally, a municipality "may be held liable only for acts for which it is actually responsible."

*Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)). Thus, a municipality cannot be held liable under § 1983 on a respondeat superior theory for acts of its employees. *Monell*, 436 U.S. at 694.

The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority. *Burge v. St. Tammany Par.*, 336 F.3d 363, 369 (5th Cir. 2003). While "a single decision by a policymaker may, under certain circumstances, constitute a policy for which a [municipality] may be liable," this "single incident exception" is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (citing *Brown v. Bryan Cnty.*, 219 F.3d 450, 462 (5th Cir. 2000); *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008)).

A pattern is tantamount to an official policy when it is "so common and well-settled to constitute a custom that fairly represents municipal policy." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 579) (quoting *Webster*, 735 F.2d at 841). Where prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Peterson*, 588 F.3d at 850 (quoting *Webster*, 735 F.2d at 842).

A pattern requires similarity and specificity: "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (quoting *Estate of Davis ex rel. McCully v. City of N. Richmond Hills*, 406 F.3d 375,

383 (5th Cir. 2005)).  "While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired."  *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 810 (5th Cir. 2017) (quoting *Estate of Davis*, 406 F.3d at 383).  A pattern also requires "sufficiently numerous prior incidents," as opposed to "isolated incidents."  *Peterson*, 588 F.3d at 851 (quoting *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)); *see also Pineda v. City of Houston*, 291 F.3d 325, 329 n.12 (5th Cir. 2002) (holding eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry where officers reported either consent or exigent circumstances); *Peterson*, 588 F.3d at 851-52 (finding that where four of twenty-seven complaints of excessive force over a three year period were "sustained," the record did not support finding the City maintained an official policy of condoning excessive force).

Here, Jones does not identify any City of Hattiesburg policy, practice or custom that endorsed the alleged constitutional violations he suffered.  *Piotrowski*, 237 F.3d at 581.  And the evidence submitted by Jones fails to provide examples of cases such as this one, where an officer allegedly provides false and misleading information in an arrest warrant and at a preliminary hearing.  Therefore, he cannot establish that any policy was the "moving force" behind the constitutional violation he alleged.  Jones has additionally failed to produce evidence that the policymaking officials for the City of Hattiesburg had the actual or constructive knowledge necessary.  *McConney*, 863 F.2d at 1184 ("Sufficiently numerous prior incidents of police misconduct, for example, may tend to prove a custom and accession to that custom by the municipality's policymakers.  Isolated instances, on the other hand, are inadequate to prove knowledge and acquiescence by policymakers."); *Pineda*, 291 F.3d at 330 n.15 (citing *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)) ("Constructive knowledge may be inferred from

the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these."). Jones has not shown a pattern of conduct sufficient to establish a custom or policy. And Jones has failed to prove that the alleged constitutional violations were of such a widespread practice that knowledge should be imputed to the policymakers of the City of Hattiesburg. The Court finds that Hattiesburg's motion for summary judgment should be granted as to Jones' claims of official policy or custom against Hattiesburg and Rockhold in his official capacity. These claims are dismissed.

### 2. Failure to Train or Supervise Claims

It is clear that a "municipality's policy of failing to train its police officers can give rise to § 1983 liability." *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000); (citing *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). In order to establish the City of Hattiesburg's liability, Jones must show "(1) the [official] failed to train or supervise the officers involved; (2) there is a casual connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

"Just as proof of a custom or practice requires more than a showing of isolated acts, proof of deliberate indifference generally requires a showing "of more than a single instance of the lack of training or supervision causing a violation of constitutional rights.'" *Burge*, 336 F.3d at 370 (quoting *Thompson*, 245 F.3d at 459). "Deliberate indifference" generally requires "at least a pattern of similar incidents in which the citizens were injured." *Estate of Davis ex rel. McCully v.*

*City of N. Richmond Hills*, 406 F.3d 375, 383 (5th Cir. 2005). In other words, "our cases require the prior acts be fairly similar to what ultimately transpired. . . ." *Estate of Davis*, 406 F.3d at 383. As the Fifth Circuit noted in *Estate of Davis*, "a showing of deliberate indifference requires that the Plaintiffs 'show that the failure to train reflects a deliberate or conscious choice to endanger constitutional rights.'" *Id.* (internal quotations omitted).

Jones claims that the City of Hattiesburg allowed "widespread practices" to flourish because supervisors failed to adequately train or supervise "their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions." [27] at ¶ 132. However, Jones has failed to offer evidence to show the inadequacy of training. Nor has Jones offered any evidence of a lack of supervision by Rockhold's superiors. A review of Rockhold's testimony reveals that in addition to graduating from the law enforcement academy in 2007, Rockhold has received training certifications in "interviewing and interrogation, and homicide and violent crimes investigation." [148-3] at 13. Without more, Jones has not put forward competent evidence of a failure to train on false arrests, false imprisonment, or on proper investigations. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 396 (5th Cir. 2009) (affirming grant of summary judgment on inadequate training claims as plaintiff failed to present evidence of training deficiencies and only speculated that procedures were not observed). Moreover, all detectives involved testified by deposition that they graduated from the Mississippi Law Enforcement Training Academy. *Benavides v. Cnty. of Wilson*, 955 F.2d 968, 972–73 (5th Cir. 1992) (holding that plaintiff cannot sustain a failure to train or inadequate training claim under § 1983 where plaintiff failed to show that compliance with minimum state-mandated training

requirements was "inadequate to enable deputies to deal with usual and recurring situations faced by jailers and peace officers").

Because Jones has not shown that Hattiesburg was deliberately indifferent in the training and supervision of its officers, the Court finds that Hattiesburg is entitled to summary judgment on Jones' failure to train claim. This claim is dismissed.

## B. Jones' Individual Capacity Section 1983 Claims

The qualified immunity doctrine protects government officials from suit if the official's conduct did not violate a clearly established constitutional or statutory law of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 230, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); *Crostley v. Lamar Cnty., Texas*, 717 F.3d 410, 422-24 (5th Cir. 2013). The normal "summary judgment burden of proof is altered in the case of a qualified immunity defense." *Wolfe v. Meziere*, 566 F. App'x 353, 354 (5th Cir. 2014) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Crostley*, 717 F.3d at 422.

Evaluating a claim of qualified immunity involves a two-prong inquiry. "First, [Jones] must claim that the defendants committed a constitutional violation under current law. Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Crostley*, 717 F.3d at 422. The court may conduct the two-pronged inquiry in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). "A defendant will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant's actions were unlawful; but if officers of reasonable

competence could disagree on the issue, immunity should be recognized." *Hernandez v. Terrones*, 397 F. App'x 954, 964 (5th Cir. 2010) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). Stated another way, a law is clearly established if every reasonable officer would know that his or her conduct was unlawful. *Eisenbach v. Zatzkin*, 728 F. App'x 307, 310 (5th Cir. 2018) (citing *Kinney v. Weaver*, 367 F.3d 337, 349–50 (5th Cir. 2004)).

"Whenever a district court denies an official's motion for summary judgment predicated upon qualified immunity, the district court can be thought of as making two distinct determinations, even if only implicitly. First, the district court decides that a certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Kinney*, 367 F.3d at 346 (citing *Johnson v. Jones*, 515 U.S. 304, 313, 319-20, 115 S. Ct. 2151, 132 L. Ed. 2d 238 (1995); *Lemoine v. New Horizons Ranch Ctr., Inc.*, 174 F.3d 629, 639 (5th Cir. 1999)). The Court "must view the facts and draw reasonable inferences in the light most favorable to the plaintiff and ask whether the defendant would be entitled to qualified immunity on those facts." *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019).

### 1. Rockhold is not entitled to qualified immunity on Jones' Fourth Amendment claim of false arrest.

Jones contends that Rockhold violated his rights under the Fourth Amendment by arresting him without probable cause. Specifically, Jones alleges that Rockhold used false and misleading information to obtain the arrest warrant and deliberately concealed exculpatory evidence.

The Court agrees that there can be no doubt that the right to be free from arrest absent probable cause was clearly established at the time of Jones' arrest. *Alexander v. City of Round Rock*, 854 F.3d 298, 306-07 (5th Cir. 2017); *see also Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994)

("The right to be free from arrest without probable cause is a clearly established constitutional right."). Also, "a police officer cannot avail himself of a qualified immunity defense if he . . . deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles." *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (citing *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)). Notably, even though this is a qualified immunity analysis, the Court must view the facts and reasonable inferences in the light most favorable to Jones. *Cole*, 935 F.3d at 452.

Jones argues that Rockhold violated the law clearly established in *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). The *Franks* case held that an officer violates the Fourth Amendment by intentionally or recklessly including a false statement in a warrant application. *Franks*, 438 U.S. at 172. "Likewise, the intentional or reckless *omission* of material facts from a warrant application may be a Fourth Amendment violation." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (emphasis added). "*Franks* requires a certain mindset and a certain conduct: an officer must intentionally, 'or with a reckless disregard for the truth,' include a 'false statement in a warrant application' or omit a material fact from it." *Nerio v. Evans*, 974 F.3d 571, 577 (5th Cir. 2020) (quoting *Kohler*, 470 F.3d at 1113).

Since *Franks*, it has been clearly established that a defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes a "false statement knowingly and intentionally, or with reckless disregard for the truth" and (2) "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. In *Franks*, the Supreme Court observed that the warrant requirement is meant "to allow the magistrate to make an independent evaluation of the matter." *Id.* at 165. "It requires affiants to set forth particular facts

and circumstances underlying the existence of probable cause," including those that concern the reliability and credibility of the source to avoid "deliberately or reckless false statement[s]." *Id.*

Still, "negligence alone will not defeat qualified immunity." *Brewer v. Hayne*, 860 F.3d 819, 825 (5th Cir. 2017). "[A] proven misstatement can vitiate an affidavit only if it is established that the misstatement was the product 'of deliberate falsehood or of reckless disregard for the truth.'" *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (quoting *Franks*, 438 U.S. at 171). But an officer may not omit "exculpatory information from the warrant affidavit, thereby precluding review by a neutral magistrate of all of the facts material to the existence of probable cause." *Kohler*, 470 F.3d at 1113; *see also United States v. Alvarez*, 127 F.3d 372, 375 (5th Cir. 1997) (finding reckless disregard for the truth and no probable cause where officer failed to disclose facts underlying conclusory statements, made statement to have similar evidence where none existed, and made misstatement of terminology under the statute).

"If the officer, acting intentionally or with reckless disregard for the truth, fails to provide a magistrate with information that was critical to a finding of probable cause, then the officer may be held liable." *Jones v. City of Grand Prairie, Tex.*, 209 F.3d 719 (5th Cir. 2000) (citing *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 2000). In *Hale*, the Fifth Circuit concluded that recklessness may be inferred when the officer's omission was "clearly critical" to a finding of probable cause. *Hale*, 899 F.2d at 400.

The Court will now apply the test set forth in *Franks* to the facts of this case. Under the first prong of *Franks*, Jones must present evidence that Rockhold, through material omissions or otherwise, made "a false statement knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155. The second prong of *Franks* requires the Court to resolve whether

"the allegedly false statement is necessary to the finding of probable cause." *Id*. at 156. To determine whether the false statement was necessary for this finding, *Franks* requires the Court to consider the faulty affidavit as if these errors were removed and the omissions were included. *Winfrey v. Rogers*, 901 F.3d 483, 494-95 (5th Cir. 2018) (citing *Franks*, 438 U.S. at 156). The Court must then examine the "corrected affidavit" to determine whether probable cause for the issuance of the warrant still exists. *Id*.

### a. The Arrest Warrant Affidavit Contained Material Misstatements and Omissions

Rockhold bases his claim that there was probable cause for the arrest on the statements contained in his Arrest Warrant Affidavit. As set out in greater detail in the Factual Background above, Jones disputes a number of statements included in Rockhold's Arrest Warrant Affidavit. In addition, in the light most favorable to Jones, he points out a number of material omissions that Rockhold should have included as they would have impacted the judge's finding on probable cause. For example, viewed in the light most favorable to Jones, below is a list of omissions and disputed statements from the Arrest Warrant Affidavit:

1. **Omission:** Rockhold states that he "received a Crime Stoppers tip that one of the suspects who shot Goudy was Montrell Lee." Rockhold actually received a call from Jabarri Goudy's father, who informed Rockhold that one of the suspects was Montrell Lee. [148-1] at 2, 12. Goudy's father did not provide any basis for this information.

2. **Omission:** In both interviews on July 6, Jones stated multiple times that he was in Gulfport at Club Illusions at the time of the murder and that video surveillance from the club would prove his alibi.

3. **Omission:** In his first interview, Jones gave a possible motive for why someone would falsely accuse Jones, indicating that he had previously been assaulted by a number of men, some of whom were from Hattiesburg. [148-1] at 13.

4. **Misstatement**: In reference to the video on Jones' phone showing him at Club Illusions in Gulfport, Rockhold stated that the "date and time appeared to have been altered superficially and that a further investigation showed that the video was taken at a later

33

date than what was told to Sergeant Rockhold." [158-1] at 11.  Jones disputes this statement. [158-1] at 4.[9]

5. **Misstatement**: Rockhold stated that "phone calls from Jones to Lee throughout the night on July 4th were deleted from Jones' phone; however, the calls were not deleted from Lee's phone log."  Jones disputes this statement. [158-1] at 2.  Once again, Rockhold's detailed thirteen-page narrative is silent on this information.  There is no mention of the cell phone call logs or of deleted calls in Rockhold's narrative.

6. **Misstatement:** Rockhold stated that Jones and Montrell Lee "turned themselves in at the Gulfport Police Department."  This is a misstatement as Jones voluntarily went to the police station to speak to law enforcement so that he could clear his name from the accusations circulating on Facebook. [163] at Exhibit 24.

7. **Misstatement and Omission**: Rockhold stated that "multiple photographic line ups were created with Jones, Keith Lee and Montrell Lee.  Jones and Keith Lee were identified by several subjects, who were at Club Memories, as being at Club Memories and that Jones was the shooter." [158-1] at 11.  No information was given as to the credibility issues of any of the witnesses.  Devonta Clark identified two different people (Timothy Donaldson and Arthur Jones) as the "shooter," two different people (Montrell Lee and Keith Lee) as the male passenger, and two different people (Brianna Patton and Nijah Gray-Lane) as the female passenger. [10]  And he relied on Facebook to initially identify Jones and Gray-Lane.  Additionally, Tamara Rice initially stated that

---

[9] According to Jones, during his interview at the Hattiesburg Police Department on July 6, this video is the same cell phone video that Rockhold claimed to have been filmed in Hattiesburg, not Gulfport.  *Id.*  In Rockhold's thirteen-page investigative narrative, he does not mention any indication of a belief that the video had been "altered superficially."  Rockhold's singular reference in the investigative narrative to this video is as follows:

> Jones showed Lieutenant McLemore a video on his FaceBook page that showed him at Club Illusions; however, Lieutenant McLemore noted that the video had been posted at 0427 hours on July 5th, leaving ample time for the murder to have been committed and return to Gulfport from Hattiesburg.

[148-1] at 14.

[10] In his Reply Brief [166], Rockhold asserts that "Clark's misidentification occurred after the arrests on July 7, and should not be considered when addressing whether probable cause existed for the arrest." [166] at ¶ 11.  According to Jones' Amended Complaint, Jones was arrested "on or about July 6." [27] at ¶ 4.  Rockhold's investigative narrative indicates that Jones was arrested the evening of July 6. [148-1] at 14.  On July 6, "Jones arrived at the Hattiesburg Police Department around 2000 (8:00 p.m.)" and was "arrested and transported to the Forrest County Regional Jail." [148-1] at 14.  Clark's misidentification occurred at 10:39 a.m. on July 7. [158-17].  Several other witness interviews were conducted on July 7.  The Arrest Warrant Affidavit at issue was prepared and signed on July 7. [158-1] at 10.  The record is not clear as to whether Jones was detained on July 6 and formally arrested on July 7, after the issuance of the arrest warrant.  However, it is undisputed that Jones' arrest was based on the Arrest Warrant Affidavit, which was presented to Judge Jerry Evans on July 7. [148-1] at 3, 33.  Rockhold does not assert that the misidentification occurred after the Arrest Warrant Affidavit was presented to Judge Evans.

she did not see the suspect, but later wrote that she was "0=100% [sure that she] saw this guy [Jones] standing outside with a homeboy," and responded negatively when asked if she was certain. Jerry Carney similarly admitted that he did not see Jones, but picked him out of a photo lineup. Rockhold conceded in his deposition that Carney did not make a positive identification of Jones. [148-3] at 166. Naporsha Thompson had been on Facebook before her interview, referred to Facebook photos and videos several times, and stated that she was told to approach police to tell the police if she saw Jones. Antonio Crosby claimed to have seen Jones walk past him two to three times inside of Club Memories but did not recognize him until someone showed him a Facebook picture of Jones. Finally, Jonathan Goudy did not tell officers he saw the shooter immediately following the incident but identified Jones out of a lineup two days later, on July 7, after sending Jones a message on Facebook on July 6.

8. **Omission:** In addition to the witnesses already mentioned, the remaining witnesses, indicated that they obtained information from what they were seeing on Facebook.

The Court finds that this showing is sufficient to demonstrate that there is an issue of material fact as to whether Rockhold acted intentionally, knowingly, or recklessly, because Rockhold either knew or should have known about these material misstatements and omissions. Further, Rockhold either knew or should have known that these material misstatements and omissions were critical to allow a judge to properly determine whether probable cause could be found.

**b. The material misstatements and omissions were necessary to the finding of probable cause for Jones' arrest.**

The second prong of *Franks* requires the Court to resolve whether "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 156. To determine whether the false statement was necessary for this finding, *Franks* requires the Court to consider the faulty affidavit as if those errors and omissions were removed. *Winfrey*, 901 F.3d at 494-95 (citing *Franks*, 438 U.S. at 156). Then, the Court must examine the "corrected affidavit" to determine whether probable cause for the issuance of the warrant still exists. *Winfrey*, 901 F.3d

483 (citing *Franks*, 438 U.S. at 156); *see also Hale*, 899 F.2d at 400 & n.3. The warrant will only be valid if the "corrected affidavit" establishes probable cause for Jones' arrest.

"Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655–56 (5th Cir. 2004) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)). Ultimate guilt or innocence is not the yardstick for measuring probable cause. *Pulliam v. City of Horn Lake, Miss.*, 32 F.3d 565 (5th Cir. 1994). Even if the officer's conclusion was mistaken, he is still entitled to qualified immunity so long as the conclusion was reasonable. *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005).

### c. "Corrected Affidavit"

Pursuant to *Franks* and *Winfrey*, the Court will provide a complete "corrected affidavit" which, when viewed in the light most favorable to the plaintiff, omits the false and misleading statements discussed above and adds the material information that Rockhold omitted. *Franks*, 438 U.S. at 156; *Winfrey*, 901 F.3d at 495. In the "corrected affidavit" below, false and misleading statements from the original affidavit will be redlined, and material omissions will be bolded.

> On 7-5-15 at approximately 0209 hours, while in route to 1720 N31st Ave. (Club Memories) in reference to a shooting, Officer Patterson was notified by Officer Wheeler who was already on scene, that the victim was being driven to Forrest General Hospital in a light colored Mercury Grand Marquis. At the intersection of Hwy 49 and N31st Ave. Officer Patterson observed a light colored vehicle leaving the scene at a high rate of speed with the hazard lights flashing. Officer Patterson then got behind the vehicle and followed it to Forrest General Hospital. Upon arrival at Forrest General Hospital, the vehicle came to a stop and three black males exited the vehicle. The driver opened the rear passenger door. Officer Patterson observed a large black male, later identified as Jabarri Goudy, fall partially out of the vehicle. At that time, Goudy did not have a pulse. Officer

Patterson then assisted hospital personnel in getting Goudy onto the stretcher, and he was taken into the hospital.

Around 1530 hours, Sergeant Rockhold received a ~~Crime Stoppers~~ tip **from Jabarri Goudy's father**, that one of the suspects who shot Goudy was Montrell Lee. **Goudy's father did not provide a basis for this information.** Sergeant Rockhold placed a photograph of Lee in a six-person line up and presented the line-up to Devonta Clark, who was with Goudy when he was shot. Clark positively identified Lee as the passenger in the vehicle that shot Goudy. Clark then pulled up a FaceBook profile belonging to "Jones A. Hunnit Million," and advised Sergeant Rockhold that this was the shooter. **Clark also produced a Facebook photo of Nijah Gray-Lane, Jones' girlfriend, stating that she was the backseat passenger in the shooter's car.** Through further investigation, Sergeant Rockhold was able to identify Arthur James Jones, Jr. as the owner of that FaceBook profile and the murder suspect.

**On 07/07/2015, Devonta Clark identified a different individual, named Timothy Donaldson, from a six-person photo lineup as the shooter. Five minutes later, when Clark was presented with another six-person lineup, he chose Arthur Jones as the shooter. Jones does not look like Timothy Donaldson. On that same date, Clark identified Brianna Patton out of a six-person lineup as the backseat passenger in the shooter's car. This is inconsistent with Clark's prior production of Nijah Gray-Lane's Facebook photos. Finally, Clark identified Keith Lee from a six-person photo lineup as the passenger in the vehicle, after initially identifying Montrell Lee as the passenger.**

On 07/06/2015, Arthur Jones Jr. and Montrell Lee **arrived** ~~turned themselves in~~ at the Gulfport Police Department, **seeking to speak with law enforcement, as they claimed they desired to clear their names from accusations circulating on Facebook.** Sergeant Rockhold relocated to Gulfport Police Department and met with Jones and Lee. Sergeant Rockhold read Jones and Lee their Miranda Rights and both individuals waived their right to a lawyer and agreed to speak with Sergeant Rockhold. Sergeant Rockhold was advised by Jones and Lee that Jones had been at Club Illusions in Gulfport with his cousin, Keith Lee, from 0145 hours to 0400 hours. **Jones claimed that Club Illusions would have him on video surveillance on July 4th and July 5th. As a possible motive for why someone would falsely accuse Jones, he indicated that he had previously been assaulted by a number of men, some of whom were from Hattiesburg.**

Jones and Lee signed consent forms allowing Sergeant Rockhold to access their cellular telephones data. **Using his phone, Jones showed Lieutenant McLemore a cell phone video on his Facebook page that showed him at Club Illusions in Gulfport; however, the video was posted at 0427 hours on July 5th,**

**over two hours after the murder.** ~~Sergeant Rockhold located video of Jones and Lee at Club Illusions, however, the date and time appeared to have been altered superficially and a further investigation showed that the video was taken on a later date than what was told to Sergeant Rockhold. Sergeant Rockhold also noted that phone calls from Jones to Lee throughout the night on July 4th were deleted from Jones' phone; however, the calls were not deleted from Lee's phone log.~~

Jones and Lee also stated that they went to Slidell, LA to purchase daiquiris at 0050 hours on 07/05/2015 and then drove to Gulfport and arrived at Club Illusions at 0145 hours. Sergeant Rockhold had Gulfport Police Department check the tag readers for Lee's vehicle tag. Sergeant Rockhold was informed that the vehicle Lee owns was not picked up by any tag readers since June 18th, when he went to Slidell, LA. Jones, Keith Lee and Montrell Lee were then arrested. Jones was charged with murder and the Lee brothers were charged with hindering a police investigation.

Multiple photographic line ups were created with Jones, Keith Lee and Montrell Lee. Jones and Keith Lee were identified by several subjects, who were at Club Memories, as being at Club Memories and that Jones was the shooter. **However, several subjects were not certain with their identifications. Two of the subjects initially stated they did not see the shooter, but they were ultimately able to pick Jones out of a photo lineup. One subject who was at the scene did not tell officers he saw the shooter immediately following the incident but identified Jones out of a lineup two days later, on July 7, after sending Jones a message on Facebook the day before. An additional subject stated Jones walked past him two to three times inside of Club Memories but did not recognize him until someone showed him a Facebook picture of Jones. Another subject used photographs off of Facebook to identify Jones.**

**All of the subjects who were interviewed received Facebook photographs of Jones before they spoke to investigators or made identifications.[11]**

There was absolutely no physical evidence connecting Jones to the murder scene. Therefore, the municipal judge had to rely on Rockhold's statements with regard to Jones' alibi and eyewitness accounts. The key eyewitness, Devonta Clark, identified two different people

---

[11] During his deposition, Rockhold confirmed that he was aware that every witness he interviewed had looked at Facebook photographs of Jones before any of them came in to speak to investigators or to make identifications. [148-3] at 60-61, 172. Rockhold also testified he knew that all of these witnesses had received photographs of Jones from someone else before interviewing with investigators. *Id.* at 61.

(Timothy Donaldson and Arthur Jones) as the "shooter," two different people (Montrell Lee and Keith Lee) as the male passenger, and two different people (Brianna Patton and Nijah Gray-Lane) as the female passenger. Rockhold's omission of these misidentifications was material for Jones because, in one scenario, he was potentially connected to the murder, and in the other, he was not in the same city. And there were significant credibility issues with each of the "subjects" who "identified" Jones which were not conveyed to the municipal judge in Rockhold's affidavit. Finally, all of these "subjects" received photos of Jones and details of the murder which had been circulating on Facebook.

Given the totality of the circumstances, the Court concludes that a reasonable judge would not have issued a warrant on the basis of this corrected affidavit, because the addition of the omitted material facts and the exclusion of the misstated facts would have dissuaded a judge from issuing a warrant. *See Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989); *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) (noting that probable cause "mean[s] more than bare suspicion"). There must be some indication that the basis of probable cause is not the product of "rumor or innuendo," such as the information circulating on Facebook in this case. *See United States v. Coleman*, 2:20-cr-23-TBM-MTP, 2021 WL 1989931, *5 (S.D. Miss. May, 18, 2021); *United States v. Pasquarille*, 20 F.3d 682, 689 (6th Cir. 1994); *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002).

In sum, in viewing the facts and reasonable inferences in the light most favorable to Jones, the Court holds (1) there is an issue of material fact as to whether Rockhold recklessly, knowingly, or intentionally made material misstatements and omitted material information and (2) a corrected

affidavit would not provide probable cause to arrest Jones. Therefore, Jones has satisfied his burden of showing that there is an issue of material fact as to whether Rockhold violated Jones' clearly established rights, and Jones is entitled to present his case to the jury. Rockhold is not entitled to qualified immunity, and the motion is denied as to Plaintiff's § 1983 claims against Rockhold in his individual capacity.

**2.    Rockhold is not entitled to qualified immunity on Jones' claims of unlawful detention.**

Even if there was probable cause to arrest Jones, which this Court finds there was not, the Court will consider Jones' claims of continued pretrial detention and lack of probable cause at the preliminary hearing held on July 29, 2015.

Jones alleges that he was wrongfully detained and falsely imprisoned for eight months, in violation of his Fourth Amendment rights, because of Rockhold's actions. In addition to the Arrest Warrant Affidavit, Jones claims that Rockhold made false statements at the preliminary hearing with regard to the Club Illusions surveillance video and concerning whether there were six individuals who identified Jones as either the shooter or being present at the scene of the murder. Jones further alleges claims of malicious prosecution and asserts that Rockhold conducted a reckless investigation.

In *Castellano v. Fragozo*, the Fifth Circuit held that "no . . . freestanding constitutional right to be free from malicious prosecution exists." *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003) ("[C]ausing charges to be filed without probable cause will not without more violate the Constitution. So defined, malicious prosecution states no constitutional claim."). The court explained, however, that "[t]he initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection – the Fourth Amendment if the

accused is seized and arrested, for example, or other constitutionally secured rights if a case if further pursued." *Castellano*, 352 at 953. Under *Castellano*, "the claimant must allege that officials violated specific constitutional rights in connection with a malicious prosecution." *Whittington v. Maxwell*, 455 F. App'x 450, 457 (5th Cir. 2011) (quoting *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010)); *see Morgan v. Chapman*, 969 F.3d 238, 245-46 (5th Cir. 2020) ("In so far as the defendant's bad actions, (that happen to correspond to the tort of malicious prosecution) result in an unreasonable search or seizure, those claims may be asserted under § 1983 as violations of the Fourth Amendment. But that makes them Fourth Amendment claims cognizable under § 1983, not malicious prosecution claims.").

In connection with his unlawful detention claim, Jones has alleged a Fourth Amendment claim for an illegal seizure based on his detention for eight months without probable cause. The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Court "adhere[s] to the view that the umbrella of the Fourth Amendment, broad and powerful as it is, casts its protection solely over the pretrial events of a prosecution." *Castellano*, 352 F.3d at 959. Pretrial detention constitutes a "seizure" within the meaning of the Fourth Amendment. *Whittington*, 455 F. App'x at 458 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)) ("[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied.").

The Supreme Court has long recognized that the Fourth Amendment establishes "the standards and procedures" governing pretrial detention. *Manuel v. City of Joliet, III*, 137 S. Ct. 911, 914, 197 L. Ed. 2d 312 (2017) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S. Ct. 854, 43 L.

Ed. 2d 54 (1975)). The Supreme Court "decided some four decades ago that a claim challenging pretrial detention fell within the scope of the Fourth Amendment." *Manuel*, 137 S. Ct. at 917. Those constitutional protections apply even after the start of "legal process" in a criminal case – here that is after the judge's initial determination of probable cause for arrest. *Manuel*, 137 S. Ct. at 914 (citing *Albright v. Oliver*, 510 U.S. 266, 274, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)).

With regard to pretrial confinement, "[t]he sole issue [under the Fourth Amendment] is whether there is probable cause for detaining the arrested person pending further proceedings." *Whittington*, 455 F. App'x at 458 (quoting *Gerstein*, 420 U.S. at 120). Prolonged pretrial incarceration without probable cause, as is Jones' allegation here, constitutes a cognizable deprivation of liberty under the Fourth Amendment. *Id.* at 458.

The right to be free from unreasonable seizures was well established in 2015. Rockhold, as the lead investigator in this case, would certainly be aware that under any interpretation of the law, it is improper to omit and misstate information that would be material to the judge's probable cause analysis at a preliminary hearing. *See Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (holding police officer cannot avail himself of qualified immunity if he procures false identification by unlawful means or deliberately conceals exculpatory evidence); *see also Franks*, 483 U.S. at 154, 155-56; *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018); *Hernandez v. Terrones*, 397 F. App'x 954, 965 (5th Cir. 2010) (reviewing district court's denial of qualified immunity where defendant withheld exculpatory evidence at an examining trial).[12] Viewing Jones' factual assertions as true, the Court finds that Jones has alleged a violation of his clearly established Fourth Amendment right to be free from pretrial detention without probable cause.

---

[12] In the state of Texas, an "examining trial" is held to determine whether there is sufficient probable cause to turn a case over to the grand jury. *Hernandez v. Terrones*, 397 F. App'x 954, 960 (5th Cir. 2010).

**Rockhold's Material Misstatements and Omissions at the Preliminary Hearing**

The purpose of a preliminary hearing is to determine whether there is probable cause to believe that the defendant has committed an offense. *Bell v. State*, 310 So. 3d 837, 842 (Miss. Ct. App. 2021) (citing *Hogan v. State*, 730 So. 2d 100, 101 (Miss. Ct. App. 1998)). "At a preliminary hearing, the judge shall determine probable cause and the conditions for release, if any." Miss. R. Cr. P. 6.2(a). "If, from the evidence, it appears that there is probable cause to believe that a felony has been committed, and that the defendant committed it, the judge shall bind the defendant over to await action of the grand jury." Miss. R. Cr. P. 6.2(f). "If, from the evidence, it appears that there is no probable cause to believe that a felony has been committed, and that the defendant committed it, the defendant shall be discharged from custody." Miss. R. Cr. P. 6.2(g).

Having concluded that Jones has a clearly established right under the Fourth Amendment to be free from false arrest and pretrial detainment without probable cause, the Court concludes that because Rockhold was "objectively unreasonable" in believing there was probable cause to continue Jones' detainment and prosecution, he is not entitled to summary judgment on these claims.

When an officer is tasked with presenting information to a neutral magistrate so that the he or she can make a probable cause determination, the officer cannot provide the magistrate with false and misleading statements or make material omissions. *See Franks*, 483 U.S. at 154, 155-56; *Winfrey v. Rogers*, 901 F.3d at 494; *see also Hernandez*, 397 F. App'x at 965. Here, Jones must present evidence that Rockhold, through material omissions or otherwise, made "a false statement knowingly and intentionally, or with reckless disregard for the truth" to Judge Polk-Payton when she made the probable cause determination at the preliminary hearing. *Franks*, 438 U.S. at 155.

Jones asserts that Rockhold made several false and misleading statements and material omissions that impacted the finding of probable cause at the preliminary hearing before Judge Polk-Payton. Contrary to Rockhold's testimony at the preliminary hearing that Jones was seen on the Club Illusions surveillance video but was absent for long periods of time, Jones can actually be seen multiple times on camera throughout the night at 1:00 a.m., 1:12 a.m., 1:22 a.m., 2:00 a.m., 2:24 a.m., and 3:17 a.m. Rockhold also testified that the times on the surveillance video were incorrect and could not be determined. However, viewing the evidence in the light most favorable to Jones, the times had been verified - to the minute - by both the club owner and detectives. Adding forty-five minutes to the times Jones was seen on the video would place him in Gulfport at approximately 1:45 a.m., 1:58 a.m., 2:07 a.m., 2:45 a.m., 3:09 a.m., and 4:03 a.m. on July 5. This would make it impossible for Jones to have been seventy (70) miles away at 2:09 a.m., the time of the murder. In her deposition, Judge Polk-Payton agreed that if she had been told that the timestamp on the video was off by forty-five minutes, she would have concluded that it would have been impossible for Jones to have been in Hattiesburg at the time of the murder.

At the preliminary hearing, Judge Polk-Payton discounted the surveillance video as "speculative," based on Rockhold's testimony that the times were incorrect and that Jones also claimed to have been in Slidell from 1:45 a.m. to 4:00 a.m. on the morning of the murder.[13] In addition, Rockhold did not tell Judge Polk-Payton that Jones' cell phone had not connected to a tower near Hattiesburg the morning of the murder, but Jones' cell phone had connected to a tower in Gulfport during that time frame. Without the surveillance videos, Judge Polk-Payton based her

---

[13] While there was no record of the preliminary hearing, Judge Polk-Payton kept detailed notes. Rockhold testified at the preliminary hearing that Jones claimed to have been in Slidell from 1:45 a.m. to 4:00 a.m. the morning of the murder. This statement contradicts both the Arrest Warrant Affidavit (that Rockhold prepared) as well as the video interview between Jones and Rockhold.

finding of probable cause on Rockhold's statements that there were "six separate individuals" who placed Jones at the scene or identified him as the person who pulled the trigger. Rockhold failed to tell Judge Polk-Payton that the key eyewitness, Devonta Clark, identified two different people (Timothy Donaldson and Arthur Jones) as the "shooter," two different people (Montrell Lee and Keith Lee) as the male passenger, and two different people (Brianna Patton and Nijah Gray-Lane) as the female passenger. Also known to Rockhold at the time of the preliminary hearing, but not shared with the judge, was the fact that Rockhold had received video confirmation that Jones' girlfriend, Nijah Gray-Lane, was at Harrah's Casino in Gulfport at the time of the shooting. Finally, Rockhold withheld all details of witness credibility from Judge Polk-Payton and that individuals were being provided with Facebook photographs of Jones before ever talking to the police. Viewing the evidence in the light most favorable to Jones, it is not apparent that there was even one credible eyewitness.

The Court must view the evidence in the light most favorable to the Plaintiff. Considering the totality of the circumstances, without Rockhold's false and misleading statements and material omissions in his testimony at the preliminary hearing, a reasonable judge would not have found probable cause to bind Jones over to the grand jury. A jury could reasonably find that Rockhold's actions were intentional or reckless. Therefore, Jones has satisfied his burden of showing that there is an issue of material fact as to whether Rockhold violated Jones' clearly established rights, and Jones is entitled to present his case to the jury. Rockhold is not entitled to qualified immunity on Jones' claims of continued detention without probable cause.[14]

---

[14] Since the Court finds that there are issues of material fact as to whether Rockhold violated Jones' rights to be free from unlawful arrest and detention at both the arrest and preliminary hearing phase, it is not necessary to address Jones' continued detention after a new suspect, Andreco Guston, was identified as the shooter. The Court notes that just as there was no probable cause for Jones' detention after the preliminary hearing, there was insufficient probable

### 3. Rockhold's reliance on *Hernandez v. Terrones*

Rockhold relies heavily on the Fifth Circuit's unpublished opinion in *Hernandez v. Terrones*, 397 F. App'x 954 (5th Cir. 2010), citing it as the prevailing authority in the instant case. In *Hernandez*, the plaintiff claimed that Detective Terrones violated his Fourteenth Amendment due process rights based on his false arrest, prosecution, and conviction. *Hernandez*, 397 F. App'x. at 961. The Fifth Circuit found that Detective Terrones was entitled to qualified immunity even if Plaintiff's Fourteenth Amendment claim for reckless investigation was recharacterized as a claim for false arrest or false detention under the Fourth Amendment. *Id*. at 967. In *Hernandez*, evidence of the allegedly suggestive identification of the plaintiff was not presented to the magistrate at the examining trial. The court found that there was ample support for the magistrate's finding of probable cause where Detective Terrones' affidavit was supported by police reports, an eyewitness statement, and a voluntary statement of the accused. *Id*. at 967. The court noted that even if a contradictory witness statement had been presented at the examining trial, a reasonable magistrate could have believed there was a fair probability that the plaintiff committed the crime. *Id*. at 968.

As to the plaintiff's Fourteenth Amendment claim for suggestive identification, the Fifth Circuit held that there was no violation of a clearly established constitutional right where the criminal defendant was afforded a fair trial and there was no admission of the unduly suggestive identification procedure. *Id*. at 970. Finally, the Fifth Circuit found that the plaintiff did not have

---

cause for Jones' continued detainment. The District Attorney testified that the Hattiesburg Police Department could have released Jones at any time. [148-1] at 103. Further, the District Attorney testified that she would have made sure Jones was released if she had known that Rockhold believed that Jones had been falsely accused. *Id*. at 87. Finally, in the affidavit in support of the search warrant for Andreco Guston's home, Rockhold did not include the fact that Jones was in prison for the murder of the same person that Guston was suspected of killing. [173-1]. In the light most favorable to Jones, there was a lack of probable cause for Jones' continued detention after Guston was identified as the murder suspect.

a claim under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) where defendants disclosed material, exculpatory evidence to the plaintiff (the criminal defendant). *Id.*

The Court finds *Hernandez* factually distinguishable from the instant case. As is explained in detail above, in the light most favorable to Jones, Rockhold made multiple material misstatements and omissions in the Arrest Warrant Affidavit and in his testimony at the preliminary hearing. After including the correct information, this Court has found that a reasonable judge would not have found probable cause to issue an arrest warrant or to bind Jones over to the grand jury at the preliminary hearing.

### 4. Independent-intermediary doctrine

Finally, Rockhold argues that he is not liable to Jones because there were three independent intermediaries that intervened to break the chain of causation between Rockhold's alleged Fourth Amendment violations and Jones' arrest and detention: (1) District Attorney Patricia Burchell who Rockhold communicated with during the investigation; (2) Judge Jerry Evans who signed the arrest warrant; and (3) Judge Polk-Payton who presided over the preliminary hearing.

Under the independent-intermediary doctrine, "'if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation' for the Fourth Amendment violation." *Jennings v. Patton*, 644 F.3d 297, 300-01 (5th Cir. 2011) (quoting *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010)). "Even an officer who acted with malice . . . will not be liable if *the facts* supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's independent decision breaks the casual chain and insulates the initiating party." *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 554 (5th Cir. 2016) (quoting

*Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988)) (emphasis in original). However, the chain of causation between the officer's conduct and the unlawful arrest "is broken only where *all the facts* are presented to the grand jury, or other independent intermediary where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Buehler*, 824 F.3d at 554 (quoting *Cuadra*, 626 F.3d at 813) (emphasis added); *see also Winfrey*, 901 F.3d at 497.

Here, in the light most favorable to Jones, many pieces of material information were either omitted or misstated in the Arrest Warrant Affidavit presented to Judge Jerry Evans and in Rockhold's testimony before Judge Polk-Payton at the preliminary hearing. Likewise, the majority of these omissions and misstatements were unknown to District Attorney Burchell. As far as the record on summary judgment is concerned, the only information presented to Judge Evans is what is contained in the Arrest Warrant Affidavit. Neither Jones nor Rockhold have shown otherwise.

Since all of the facts were not presented to Judge Jerry Evans, as required by the independent-intermediary doctrine, a jury could find that the false statements and material omissions tainted the judge's finding of probable cause. Therefore, the Court finds that, considering the factual issues surrounding the false and misleading information in the Arrest Warrant Affidavit, Rockhold cannot avail himself of the independent intermediary doctrine.

Viewed in the light most favorable to the Plaintiff, Rockhold also made several false and misleading statements and omitted material information during his testimony before Judge Polk-Payton at Jones' preliminary hearing. Since all of the facts were not presented to Judge Polk-Payton, the fact finder could similarly determine that the factual issues surrounding the false and misleading information at the preliminary hearing tainted Judge Polk-Payton's finding of probable

cause. Therefore, the Court finds that Rockhold cannot avail himself of the independent intermediary doctrine at the preliminary hearing phase.

Finally, with regard to the District Attorney, Defendants do not cite any case where a district attorney was deemed a sufficient intermediary to break causation. It was not District Attorney Burchell's determination or advice that resulted in the warrant being issued. Even if her opinion had some relevance to the warrant being issued, per the discussion below, any reliance by Rockhold on her advice does not make his actions per se objectively reasonable or relieve him of any potential liability. *Hamilton v. McLemore*, 2:19-cv-47-KS-MTP (S.D. Miss. Mar. 31, 2021) (citing *Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 78 L. Ed. 2d 271 (1986)); *Burroughs v. City of Laurel, Mississippi*, 2:19-cv-48-TBM-MTP, 2021 WL 1723092, *8 (S. D. Miss. April 30, 2021).

Defendants cite several cases from other circuits that have found that the act of seeking advice from a prosecutor can factor into the qualified immunity analysis as to the reasonableness of an officer's actions. [149] at 25.[15] While these cases may be persuasive, they are not binding, and none of them found any sort of absolute immunity – only that seeking such prosecutorial advice may be a *factor* to be considered for qualified immunity purposes. Here, the Court has determined that probable cause was so lacking in the Arrest Warrant Affidavit that it was objectively unreasonable for Rockhold to believe that probable cause existed for the arrest. Furthermore, District Attorney Burchell was only privy to the information Rockhold shared with her. For example, she was unaware of the multiple credibility issues with the eyewitnesses, including the fact that Devonta Clark had identified two different people as the shooter (Jones and Timothy

---

[15] Defendants cite to *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004); *Cox v. Hainey*, 391 F.3d 25 (1st Cir. 2004); *Dixon v. Wallowa Cnty.*, 336 F.3d 1013 (9th Cir. 2003); *Wadkins v. Arnold*, 214 F.3d 535 (4th Cir. 2000); *Lavicky v. Burnett*, 758 F.2d 476 (10th Cir. 1985); and *Belsito Commun., Inc. v. Decker*, 845 F.3d 13 (1st Cir. 2016).

Donaldson), two different people as the male passenger (Keith Lee and Montrell Lee) and two different people as the female passenger (Nijah Gray-Lane and Brianna Patton). She never viewed the surveillance video and did not know that Jones could be seen on the video multiple times throughout the night, very close to the time of the murder. Since all of the facts were not presented to District Attorney Burchell throughout the investigation, the Court finds that Rockhold's reliance on the independent intermediary doctrine is misplaced.

**C.      Jones' Claim of Speedy Trial Violation**

The sole remedy for a violation of the right to a speedy trial is the dismissal of the criminal charges. *Betterman v. Montana*, ___ U.S. ___, 136 S. Ct. 1609, 1615, 194 L. Ed. 2d 723 (2016) (citing *Strunk v. United States*, 412 U.S. 434, 440, 93 S. Ct. 2260, 37 L. Ed. 2d 56 (1973) (citing *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)); *see Patterson v. Hinds Cnty., Mississippi*, No. 3:13-CV-432-CWR-FKB, 2016 WL 7177762, at *8 (S.D. Miss. June 10, 2016) (finding monetary compensation is "foreclosed by law," and that Plaintiff was ineligible for allowed remedies of either a speedy trial or dismissal since he had already been released). Since Jones has been released, his speedy trial violation claim fails. Therefore, the Court finds that Defendants' motion for summary judgment on this claim is granted, and Jones' claim for speedy trial violation is dismissed.

**D.      Jones' State Law Claims**

The Court now turns to the state law claims asserted in his Amended Complaint: reckless disregard for Jones' well-being, malicious prosecution, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, slander per se, and negligence per

se.[16] At the hearing on February 8, 2021, Jones conceded all remaining state law claims, with the exception of his claim that liability attaches pursuant to the Mississippi Tort Claims Act (MTCA) as Defendants allegedly acted with reckless disregard for Jones' safety and well-being.

The MTCA provides immunity to governmental entities and employees that act within the course and scope of employment duties. Under Section 11-46-9(1)(c) of the MTCA, a governmental entity and its employees, acting within the course and scope of their employment or duties, shall not be liable for any claim "arising out of any act . . . in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(1)(c). The Mississippi Supreme Court has determined that "[police and fire fighters] are not liable for mere negligence." *Maldonado v. Kelly*, 768 So. 2d 906, 909 (Miss. 2000). State peace officers can still waive their immunity under the MTCA by "acting in reckless disregard of the safety and well-being of citizens not engaged in criminal acts." *City of Jackson v. Lipsey*, 834 So. 2d 687, 692 (Miss. 2003).

Under Mississippi law, the term "reckless disregard" is "synonymous" with the terms "willful and wanton," which requires "knowingly and intentionally doing a thing or wrongful act." *Turner v. City of Ruleville*, 735 So. 2d 226, 230 (Miss. 1999). The Mississippi Supreme Court has characterized "wantonness" as "failure or refusal to exercise any care," while mere negligence is the "failure to exercise due care." *Beta Beta Chapter of Beta Theta Pi Fraternity v. May*, 611 So. 2d 889, 895 (Miss. 1992).

---

[16] Jones' claims for negligent infliction of emotional distress and negligence per se were previously dismissed with prejudice [26].

The City of Hattiesburg claims that "Rockhold acted objectively reasonable in the investigation, and the arrest was supported by probable cause." [149] at 34. Jones argues that Rockhold's actions did amount to reckless disregard and "adopts by reference all arguments" made against Rockhold in prior sections of his brief. [161] at 42.

As set out previously in this opinion, Jones has made a substantial showing that there is a material issue of fact as to whether Detective Rockhold acted intentionally, knowingly, or recklessly because Detective Rockhold either knew or should have known that the numerous material misstatements and omissions he made could lead to an arrest and unlawful detainment of Jones without probable cause. Viewing the facts in the light most favorable to Jones, as is required by the summary judgment standard, the fact finder could reasonably find that Rockhold's actions rise to the level of reckless disregard for the well-being and safety of Jones. *See Mahoney v. City of Jackson*, 3:07-cv-173-DPJ-JCS, 2008 WL 2990906, *8, 12 (S. D. Miss. July 25, 2008) (denying summary judgment on qualified immunity defense and on MTCA claim where question of fact existed as to whether the officer violated plaintiff's constitutional rights).

The Court finds that the Defendants' motion for summary judgment on Jones' MTCA claim of reckless disregard is not well-taken and is denied.

## V. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Jones moves for partial summary judgment based on Defendants' alleged failure to plead the affirmative defense of contributory or comparative negligence. Jones asserts that Defendants waived these defenses, as Rule 8(c) of the Federal Rules of Civil Procedure requires that these defenses be affirmatively pled. In the alternative, Jones argues that he is entitled to summary

judgment on the grounds that contributory or comparative negligence is not a defense to violations of 42 U.S.C. § 1983.[17]

In response, Defendants argue that Jones' claim must fail as he does not cite any Fifth Circuit precedent in support of his argument that contributory or comparative negligence does not apply to § 1983 cases. Defendants further argue that their lack of causation defense is not the equivalent of the affirmative defense of contributory or comparative negligence. Finally, Defendants assert that they have not waived the defense of contributory or comparative negligence.

Federal Rule of Civil Procedure 8(c)(1) states: "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1). "Failure to timely plead an affirmative defense may result in waiver and the exclusion of the defense from the case." *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014) (citing *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 342-43 (5th Cir. 1988)). An affirmative defense is subject to the same pleading requirements as the complaint. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999). A defendant must plead with "enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced." *LSREF2 Baron*, 751 F.3d at 398 (quoting *Rogers v. McDorman*, 521 F.3d 381, 385-86 (5th Cir. 2008)) (internal citations omitted).

---

[17]While the Court need not address this argument since it finds that Defendants failed to affirmatively plead the defenses of contributory and/or comparative negligence, the Court notes that numerous authorities have held that theories of comparative negligence and contribution are inapplicable to federal constitutional rights violations. *See Cordova v. City of Albuquerque*, 816 F.3d 645, 659 (10th Cir. 2016); *McHugh v. Olympia Ent., Inc.*, 37 F. App'x 730, 736-37 (6th Cir. 2002); *Nichols v. Knox Cnty., Tennessee*, No. 3:11-cv-417-PLR-HBG, 2016 WL 9149585, at *1 (E.D. Tenn. June 13, 2016); *Sahota v. Cobb*, No. 14-2722, 2015 WL 6835480, at *3 (W.D. La. Nov. 6, 2015); *Blair v. Harris*, 993 F. Supp. 2d 721, 727 (E.D. Mich. 2014); *Baker v. Union Township, Ohio*, No. 1:12-cv-112, 2015 WL 6468386, at *3 (S.D. Ohio Oct. 27, 2015); *Burge v. Par. of St. Tammany*, No. 91-2321, 1995 WL 317125, at *3 (E.D. La. May 24, 1995).

However, "a technical failure to comply precisely with Rule 8(c) is not fatal." *Levy Gardens Partners, 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013) (citing *Aunt Sally's Praline Shop, Inc. v. United Fire & Cas. Co., Inc.*, 418 F. App'x 327, 330 (5th Cir. 2011) (citing *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855 (5th Cir. 1983)). "A defendant does not waive a defense if it was raised in a 'pragmatically sufficient time' and did not prejudice the plaintiff in its ability to respond." *LSREF2 Baron*, 751 F.3d at 398 (citing *Rogers*, 521 F.3d at 386). "A district court has discretion to determine whether the party against whom the defense was raised suffered prejudice or unfair surprise as a result of the delay." *Id.* (citing *Levy Gardens*, 706 F.3d at 633.

The Court finds that Defendants' failure to affirmatively plead the defenses of contributory and comparative negligence results in the waiver of these defenses. Not only did Defendants fail to affirmatively plead these defenses in their Answer, no effort has been made to specifically articulate these defenses in a proposed Amended Answer. Nor have Defendants indicated to whom and on what basis they desire to allocate fault. Even if these defenses had been raised, Defendants have not presented any evidence indicating an apportionment of fault that would allow them to survive summary judgment. Defendants point to interrogatory responses and deposition testimony filed in a companion case as well as testimony by District Attorney Burchell that she was in charge of felony sign-ins to support their position that Jones should be on notice of their intent to raise the defenses of contributory or comparative negligence. [156] at 5. The Court finds this argument unavailing as it is unclear how Defendants are raising these defenses or how they would apply to the case at hand. Certainly, Defendants have not cured their failure to comply with Rule 8(c). And Plaintiff has had no opportunity to conduct meaningful discovery on the defenses.

Defendants have failed to raise these defenses in a manner that would prevent "prejudice or unfair surprise as a result of the delay." *LSREF2 Baron*, 751 F.3d at 398 (quoting *Levy Gardens*, 760 F.3d at 633). Therefore, the Court finds Jones' motion for partial summary judgment is granted.

## VI. CONCLUSION

**IT IS THEREFORE ORDERED AND ADJUDGED** that Defendants' Motion [148] for Summary Judgment is **GRANTED** as to the claims against Defendants City of Hattiesburg and Neal Rockhold, in his official capacity, and these claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants' Motion [148] for Summary Judgment is **GRANTED** as to Plaintiff's claim of speedy trial violation against Defendants, and this claim is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendants' Motion [148] for Summary Judgment is **DENIED** as to Plaintiff's § 1983 claims against Rockhold in his individual capacity and Plaintiff's state law Mississippi Tort Claims Act claim of reckless disregard against the City of Hattiesburg and Rockhold. All other state law claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' Motion [164] to Strike Exhibits is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED AND ADJUDGED** that Plaintiff's Motion [143] for Partial Summary Judgment is **GRANTED**.

THIS, THE 28th DAY OF JUNE, 2021.

TAYLOR B. McNEEL
UNITED STATES DISTRICT JUDGE